We move to the second case this morning, Truelove v. Berryhill. Your honors, may it please the court. My name is Jason Scott Rodman and I represent the appellant Garrick Truelove. I will be attempting to preserve three minutes for rebuttal. It's a Step 5 Social Security case. He was granted benefits, I believe based on a psychological listing, but then those were taken away and this case is about the new application. And so this case today, an oral argument today, is really about intermittent explosive disorder and upper extremity limitations. And these things were not accounted for in the residual functional capacity in violation of 405G requiring substantial evidence. And so to talk about the intermittent explosive disorder, I mean that really manifests itself as his temper, the blackouts, the safety risk. But the ALJ specifically in addressing the RFC excluded a production-paced work job for him because of his anger issues. So did the ALJ specifically address that aspect of the mental health issue and accounted for it? It's for sure correct that he, that the ALJ included, you know, saying not production pace, but it is the plaintiff's position that that does not account for something like intermittent explosive disorder, which involved this gentleman, Mr. Truelove, basically getting angry. And if you look at what intermittent explosive disorder is, it's grossly out of proportion to the provocation or trigger. And there's frequency requirements in the very diagnosis. So the fact that the diagnosis went on from February 2015 on through almost a year later itself says something about the frequency and perceived problem of these episodes happening. And so if he's blacking out and getting angry and doesn't have control of himself, that's not something that production pace, for example, accounts for in the residual functional capacity. And so the ALJ does admit that, you know, he needs moderate, and this is in a different section of the opinion, that Mr. Truelove needs moderate limitations in concentration persistence and pace and characterizes that as, you know, based on following instructions, handling stress, handling changes to routine. And these things roughly coincide with some of the things that when he talks about the job things that have happened, apparently triggered some of his temporal problems. But it doesn't take into account some of the core things about intermittent explosive disorder or about the things testified about and documented and supported by his counselor, as well as the record otherwise, in that they're out of proportion, and as his dad testifies about, he loses control. And these things need to be accounted for in the residual functional capacity, and there isn't substantial evidence to not include them. The second argument today, it's focused, and I think the first one's clearly the lead, but the second one is a significant error, in that he injured his shoulder, and he worked some heavy jobs with the combination of things he was dealing with. In some way, those are the jobs that were put before him, and he did his best. He ended up getting fired. He had multiple temper episodes and other problems in each job. But the issue with the lack of upper extremity limitations in the RFC is that the record documents that those existed from up through at least the range of motion limitations at the physical consultative exam, and then even later reinforcing what was discussed at the physical consultative exam, Dr. Smith's exam, on exam with inspection, there was joint swelling found. On exam with palpation, the feeling- But she also found that he was showing improvement. In August of 2014, Dr. Smith found that the right elbow was fully healed, and in March of 2016, she found that the examination was normal other than some tenderness. How do you get around that? This is why I think it's an important argument, even though it's not my lead argument today. But it comes down to that last part you mentioned, which is that there was the continuing tenderness, that it continues to be a problem. He testifies at hearing how he'll lift things, and the things he talks about lifting are ordinary things, but he has to do them in a special way, using one hand to lift, the other hand to balance. But none of that is accounted for in the residual functional capacity, which is a substantial evidence problem and would affect the types of jobs that supposedly he'd be able to do. In addition to the fact that, for example, early on at one of the surgeries, the doctors do tell him to stop smoking. But with Seventh Circuit case law, it's a disapproved credibility argument to say, oh, well, they're not smoking, so we're not going to take their record and their testimony about their impairment seriously. So instead, that case law indicates it's really a sign of an addiction. And with everything he's dealing with, it's really only plausible that that was the case here, in addition to the fact that, and I think, as you pointed out, Your Honor, he still had tenderness later on. And while that's not a major thing, it's still something even non-severe impairments need to be accounted for in the residual functional capacity. And so for these reasons, and because the record shows he pushed himself to work and had some other problems, we ask that you remand. Unless there's other questions right now, I'm happy to reserve remaining time for rebuttal. You may do so. Thank you, Counsel. Ms. Russell. Yes, Your Honor. Thank you. My name is Mary Ellen Russell, and I represent the FLE, the Acting Commissioner of Social Security. Your Honors, Mr. Truelove has failed to demonstrate that the ALJ erred in any way with respect to the RFC at all. At the beginning of the period of issue, Mr. Truelove was not undergoing any sort of medical treatment, or mental health treatment I should say, nor was he taking any medications for his mental health treatments. And at that point in February of 2015, when he was found on an overpass about to jump, he tested positive for a high blood alcohol level as well as marijuana. As the ALJ noted, once Mr. Truelove began mental health treatment and went back on medications, his condition significantly improved. And even Mr. Truelove admitted that that was the case. He felt better. He testified that his sleep, his racing thoughts, his anger in his mood, all improved. And when Mr. Truelove wanted to stop therapy, his therapist agreed that that would be okay. There's nothing in the record that shows any hesitation on the therapist's part to release him from therapy. Moreover, with regard to his anger issues, Mr. Truelove testified himself that the source of that anger was primarily discord in the home, and when that resolved, so did his anger issues. Nevertheless, the ALJ did accommodate in the RFC his intermittent explosive disorder. The ALJ reserved one day a month and said that he could possibly be absent from work due to residual issues with his temper. So it was in fact accommodated in the RFC. With regard to the blackouts that Mr. Truelove alleges, it seems that he's not asserting that he in any way lost consciousness. He is asserting a lapse of attention or focus. The ALJ also addressed that by providing for the moderate limitations in concentration, persistence, and pace. Moreover, the mental health treatments showed that his memory and cognition were normal, so the accommodation for moderate limitations with no production pace, with the fact that he could stay on task for normal breaks, that more than accommodates the limitations in concentration. The safety issues is not clear at all what he's really arguing is a safety issue other than his plan to jump, which resolved with treatment, and he doesn't specify what safety issues there are in the record that anybody talked about. So that's really a non-issue. With regard to the physical impairment, as you pointed out, Judge, the elbow fracture healed. At the point of 2014, the only significant finding was a slightly reduced grip strength on the right, 4 out of 5, and slight atrophy of the intrinsic hand and thumb muscles with a slightly reduced range of motion. The DDS doctors reviewed that evidence and found that that did not constitute a severe impairment, did not meet the durational requirement of 12 months, consistent, and from there, his elbow impairment improved to the point where, as you noted, Judge, Dr. Chapman-Smith found full strength, normal stability, and normal muscle strength and tone. So the only thing wrong was the slight tenderness at the tip of the elbow. But earlier, Mr. Truelove was able to do lifting and other activities. He was mowing lawns, he was helping his neighbors with things. So there's more than substantial evidence to show that that elbow impairment was not severe and did not meet the durational requirement. Further, counsel's reference to the smoking as an error on the ALJ's part should be waived. He did not raise that below. But even if he had, that argument would be meritless because the ALJ was simply referencing what the doctors themselves had said about Mr. Truelove's healing, that he was impeding his own healing by smoking. This was not the ALJ attacking the claimant or in any way penalizing him. He was simply referencing what was in the record as evidence. So given the substantial evidence that the ALJ cited throughout the decision, we respectively request that you affirm the decision. And also, can I clarify too that at page 23 of your brief, Mr. Truelove asks that this court award him disability benefits and Medicare benefits. Neither of those are at issue. He has not applied for those, nor is he entitled to them. If there are no questions. Thank you, counsel. Thank you. Mr. Robb. Your Honor, just a few responses in rebuttal. First off, as to the treatment record, and this was discussed in the briefing, he does have this desire to not be in treatment, which isn't necessarily consistent with not having the problems. And that happens, I believe it's in 14F, in December 2015. And they kind of go along with it. But within the next couple months, there is a document in the record of February 2016 that he does have a counselor that apparently he gets along with, who further documents his ongoing struggles with the intermittent explosive disorder. And that he has an ongoing struggle with the symptoms, and that treatment is expected to last for years. And so those things in combination. And in terms of the safety question, and some of this comes, again, back to this intermittent explosive disorder and the things about the work record. The intermittent explosive disorder, it's a technical term. And so, you know, sometimes it's heightened if there are things that damage property or a person, but even verbal outbursts are relevant. But this was at issue and relevant because the vocational expert testified that even one time, losing one's temper in the workplace in the sort of fashion that Trulove has, can itself lead to dismissal. She said a second chance may be allowed as long as the temper was not lost with the supervisor. But if the temper was lost with the supervisor, there would be no further chance. But for Trulove, there wasn't just that one incident where he went to jump off a bridge. There was also the suicidal ideation regarding possible hanging, a time he threatened to jump off a car, a time he hit himself in the workplace with a pencil, some other incident with a grinder. And something about a grinder held against his thumb? Yeah, I didn't fully understand it, but I got the gist of it, that it was connected to the anger issues. And for these reasons, we ask that you remain unless you have any other questions for me? I don't believe so. Thank you very much, counsel. Thanks to both counsel in the cases taken under advisement.